MEADOW GREEN–WILDCAT CORPORATION, d/b/a Wildcat Mountain Ski Area, Plaintiff, Appellant,

v.

Michael B. HATHAWAY, etc., Defendant, Appellee.

No. 90–1788.

United States Court of Appeals, First Circuit.

Heard Jan. 9, 1991.

Decided June 20, 1991.

Randall F. Cooper with whom Cooper, Fauver & Deans, P.A. was on brief, North Conway, for plaintiff, appellant.

Nancy E. Hart, Asst. U.S. Atty., with whom Jeffrey R. Howard, U.S. Atty., was on brief, Concord, N.H., for defendant, appellee.

Before BREYER, Chief Judge, ALDRICH, Senior Circuit Judge, and TORRUELLA, Circuit Judge.

BREYER, Chief Judge.

This case turns on the meaning of the word "error" in a land use permit that the Forest Service issued to a ski resort owner. *See* 16 U.S.C. § 497. It raises a difficult question about the standard of review that a court should apply to the Forest Service's own interpretation of such a document. Ultimately, we decide that, for reviewing purposes, we should treat the permit (called a "Term Special Use Permit") as if it were a kind of contract between the Service and the resort owner. That is to say, we should allow the agency no more freedom to interpret the words of such a permit than were that permit a contract between a government agency and a private party. That being so, we conclude that the Forest Service incorrectly interpreted the word "error" in the Term Permit, and we reverse a district court judgment in its favor.

# I
## Background

The background facts are fairly simple. In 1986 Meadow Green–Wildcat Corporation ("Meadow Green") bought the assets of Wildcat Mountain Corporation ("Wildcat"), a ski resort operated on federal land at Pinkham Notch, New Hampshire. In October 1986 the Forest Service issued Meadow Green a new Term Special Use Permit, allowing it to use this federally owned land for twenty years in return for a fee. *See* Appendix A. The Term Permit contained detailed rules for calculating that fee. The Term Permit said that, among other things, the Service would calculate the fee on the basis of Meadow Green's investment in the ski area assets, which the Permit stated was $5,049,853. The Permit's fee calculation rules call that investment "Gross Fixed Assets" or "GFA." The Term Permit also said, however, that the Service could recalculate the fee and apply the new fee retroactively if this $5,049,853 "GFA" figure was an "error." To be specific, the Term Permit stated the following:

> As of April 30, 1986, the initial GFA under this ownership has been determined to be $5,049,853 as shown in detail on attached schedule, [sic] 1, "Gross Fixed Assets." If an error is found in the GFA amount, *it shall be changed to the correct amount retroactive to the date the error occurred.*

(Emphasis added.)

In 1989 Forest Service auditors announced they had found an "error" in the GFA amount. They said it should have been $3,195,911. The Service then recalculated the fee for 1986, 1987, and 1988. And, it asked Meadow Green to pay approximately $65,000 in additional fees for those years.

After exhausting its agency appeals, Meadow Green asked the federal district court to review, and to set aside, this agency determination. *See* 5 U.S.C. § 701 *et seq.* It said the Service was wrong about the "error," for there was no error, and, in any event, the court should estop the agency from denying the $5 million figure. The district court granted summary judgment for the Service, and Meadow Green has appealed. In our view, the $5 million figure is not "an error" within the meaning of those words as used in the Permit. Consequently, the Service's determination was "not in accordance with law" and must be set aside. 5 U.S.C. § 706(2)(A). Therefore, we need not reach the question of agency estoppel.

# II
## The Standard of Review

■ A Forest Service regulation that defines a "Term Permit," the kind of permit now before us, says that such a Permit is "compensable according to its terms." 36 C.F.R. § 251.51. The words "an error" are terms of the present Permit. Thus, the Service's revised fee is correct, and lawful, if the $5 million figure was "an error," but not otherwise. In deciding the meaning of the term "an error," however, are we to defer to the agency's interpretation of those words? In other words, are we to treat the Term Permit as if it were an agency regulation, or a statute in which Congress has delegated interpretive power to the administering body? *See, e.g., Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (courts should defer to reasonable agency interpretations of statutes); *Udall v. Tallman*, 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616 (1965) (courts should give controlling weight to reasonable agency interpretations of regulations). Or, should we treat the Permit like a contract that the government might make with a private party, giving less weight to the agency's interpretation of the document's language, the meaning of which raises a "question of law?" *See, e.g., Halifax Engineering, Inc. v. United States*, 915 F.2d 689, 690 (Fed.Cir.1990); Shea and Schaengold, *A Guide to the Court of Appeals for the Federal Circuit*, Briefing Papers (December 1990) at 5 ("It is well established that the interpretation of a contract is a matter of law that may be freely decided by the Federal Circuit.").

We believe that for several reasons we should treat the Term Permit document rather like a contract for reviewing purposes. First, the Permit document itself reads like a contract. It provides long-term authority to use land in return for the permittee's payment of a rental fee. It is twenty-two pages long and contains a highly detailed set of terms and conditions. It uses contract-like language, such as "this permit may be revoked upon breach of any of the conditions herein." Both the Forest Supervisor and the permittee have signed the document, the latter placing his signature under the statement that he "agree[s]" that he "accepts and will abide by" the document's "terms and conditions." We think that the expectation of a person signing such a document is that its terms would bind both him *and* the Service. Although the terms of the document give the Service power to change various conditions, such as rental conditions, for the future, or even to revoke the Permit on 30 days notice, nothing in the document, or regulations, or authorizing statute suggests that the Service is to have some special advantage, not shared by the permittee, in interpreting the meaning of the document's terms. Indeed, it would seem surprising and unfair if the terms of this document, without so stating, bind the permittee but leave the other party (the Service) free to interpret those same terms as it wishes (limited only by the bounds of "reasonableness").

Second, the statutes that authorize the Forest Service to issue Term Permits state that their purpose is to allow the construction and operation of "hotels, resorts, and other [recreational] structures," 16 U.S.C. § 497, all facilities that "are ... likely to require long-term financing." 16 U.S.C. § 497b. These phrases suggest that one function of the permit is to offer a permittee the security needed to raise many millions of dollars in investment. It is difficult to reconcile the Service's desire for "deference" to its interpretation of the Permit with this purpose. We do not see how a document, the terms of which one party remains comparatively free to interpret to its own advantage, can provide the other party (and its financial backers) the security, stability, or assurance a large and long-term investment would seem to require.

Third, the Service's official regulations treat the Term Permit as if it were a kind of contract. As we have previously said, the regulations state that the Permit is "compensable according to its terms." 36 C.F.R. § 251.51. Moreover, these regulations define a Term Permit very much as they define a "lease," an instrument the terms of which bind the parties. The first is defined as "a special use authorization to occupy and use ... land ... for a specified period which is both revocable and compensable according to its terms." The second is defined as a special use authorization which conveys a right of occupancy and use of ... land ... for a specified period and purpose and is both revocable and compensable according to its terms." *Id.* Moreover, the regulations say that a permittee may "sublet the use and occupancy of the premises." 36 C.F.R. § 251.55(a). Further, these regulations reserve for the government specific rights, such as "continuing right of access," *id.* § 251.55(b)(1), thereby suggesting that the permit grants other definite rights to the permittee. These regulations reiterate and elaborate upon the statutory expectation that a ski area permittee will make "existing on site investment" of considerable "magnitude," and that the "magnitude of planned facilities ... [will] require long-term financing and/or operation." 36 C.F.R. § 251.56(b)(2)(E). Although the regulations also state that the Government is free to "revoke" or "terminate" the Permit in the manner and for the reasons specified by the Permit, a contract that one party may terminate for specified reasons is no less a contract. *See* Farnsworth, *Contracts* § 2.14 at 77–78 (1982). And unless and until it is terminated, its terms govern actions taken by both parties.

Fourth, the authority that the Government cites for the contrary proposition offers it no real support. The Government cites *Chevron, supra,* which instructs the courts to pay particular attention to an agency's interpretation of its governing

*statute,* at least when courts can infer (from language and circumstances) that Congress, in enacting the statute, intended the courts to do so. *Chevron* does not dictate a reviewing court's attitude towards the language of a contract, or of a document that resembles a contract, particularly under circumstances where too much court "deference" would seem to work at cross-purposes with Congress's likely statutory intent. Other similar cases, such as *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, require a reviewing court to give controlling weight to an agency's reasonable interpretation of its own *regulations. Id.* at 4, 85 S.Ct. at 795. Such cases reflect the common sense intuition that an agency is more likely than a court to know what its own regulations mean, as well as the legal inference that Congress, delegating authority to an agency to promulgate such regulations, likely intended a degree of "deference." However, neither the language nor the reasoning of those cases suggests they require similar deference to the agency's interpretation of a contract that it makes with an outside party, or, for the same reasons, to a Permit that bears all the earmarks of a contract.

The government also refers to language in an unreported district court case quoted in a Court of Claims case called *Mountain States Telephone and Telegraph Co. v. United States,* 204 Ct.Cl. 521, 499 F.2d 611 (1974) which says, "[a] special use permit is not a lease." *Id.,* 499 F.2d at 615–16. This language is *dicta,* for *Mountain States* involved interpretation of the language of a regulation, not a permit. But, in any event, the language is beside the point, for the issue here is not whether the "special use permit" (which may or may not have been the same kind of "term permit" here at issue) is a "lease." The issue is whether a court reviewing an agency's interpretation of the language in such a permit should or should not treat it like a contract, a matter on which neither *Mountain States,* nor the district court case, sheds any light.

■ In sum, we find no strict instruction in the law that a reviewing court must give

an agency great (legislative or regulatory) "leeway" or "deference" whenever it interprets the meaning of words on any piece of paper emanating from that agency. Rather, the degree of leeway or deference due depends upon many different factors, including the function that the paper serves, viewed in light of governing statutes and regulations. In this instance the statute, the regulations, and the form and function of the paper itself all suggest that we exercise a degree of independent judgment in interpreting its language. Thus, without holding that the Permit "is" a contract, or that courts should always consider it as such, we shall treat it like a contract for purposes of deciding how much weight to give the interpretation one party (here the agency) offers for one of its nontechnical terms. *See, e.g., Halifax Eng'g, Inc.,* 915 F.2d at 690.

## III

### *The Meaning of "Error"*

■ For purposes of this case, we shall assume that the Permit's words "error ... in the GFA amount" (the words that allow a retroactive fee adjustment) include such mechanical and fact-related matters as arithmetical mistakes, mistakes in calculation, misreporting of asset values, and the like. We are also willing to assume (but purely for argument's sake) that they include a Service officer's failure to follow a clear instruction in the publicly available Forest Service Manual, a Manual that (among many other things) explains to the public and to the Service officers themselves just how the officers should go about calculating the Permit's GFA figure. *See* 36 C.F.R. § 216.2(a) (Manual includes "general instruction and direction needed on a continuous basis by Forest Service officers at more than one unit ..."). We believe, however, that those words do *not* include retroactive revisions to a figure that reflects an officer's reasonable interpretation of an ambiguous Manual instruction which the Service later decides to interpret differently. And, without including *this kind* of interpretive error within the scope of the Permit's words "an error," the

Service cannot prevail here (for the reasons explained in Part IV, *infra* ).

We interpret the word "error" in the contract to exclude such retroactively corrected errors in judgment for several reasons. First, the Permit itself suggests that the kind of "error" in question is mathematical, arithmetical, fact-related, and the like, for it uses the word just after a sentence that says that the GFA "has been determined to be $5,049,853 as shown in detail on attached schedule, 1," which identifies the cost of various assets. It goes on to say, "If an error is found in the GFA amount" it may be corrected retroactively. It uses the word "error" again, three pages later, when it says,

> All fee calculations and records of sales and GFA are subject to period audit. Errors in calculation or payment will be corrected as needed for conformance with those audits.

Since the word "error" appears in the context of detailed, listed amounts, references to "calculation or payment" and "audits," this suggests it covers errors in stating, or calculating, figures, not judgmental errors, or errors of interpretation.

■ Second, the Forest Service itself has repeatedly held that the word "error" means an error in arithmetic and not an error in judgment. In January 1986, for example, in a case involving Snowbird Ski area, the Chief of the Forest Service wrote that "only those changes relating primarily to errors [in] ... arithmetic can reasonably be interpreted as subject to unilateral correction." In 1989, in a case involving Winter Park Ski Area, the Associate Deputy Chief of the Forest Service wrote, "we find the language is not clear that the intent was to provide for correction of errors of judgment." We would not say that the Service is bound by these informal interpretations. *See Quinonez–Lopez v. Coco Lagoon Development Corp.*, 733 F.2d 1, 4 (1st Cir.1984). But, we believe that a reviewing court is free to consult such publicly available, comparable agency interpretations of the Permit's language, as it consults an agency's published opinions, to see if the agency is acting consistently. *Cf.*

*Exxon Corp. v. Department of Energy*, 91 F.R.D. 26, 41–42 (N.D.Tex.1981) (permitting discovery of contemporaneous agency interpretations of ambiguous regulations); *Apex Construction Co. v. United States*, 719 F.Supp. 1144, 1147 n. 1 (D.Mass.1989) ("Other possible grounds for obtaining discovery beyond the administrative record include ... discovery of the agency's 'contemporaneous construction' of a particular term or regulation where the meaning is vague or ambiguous or where construction used in the particular case appears inconsistent."). And, where it is not, the court may pay somewhat less attention to its position.

Finally, a different interpretation of the word "error"—an interpretation that would allow the agency to count as "an error" a judgmental miscalculation as to how the agency would later interpret an ambiguous instruction—would give the agency unusually broad powers to assess fees retroactively, to change its interpretations in surprising ways, and to use those changes to increase fees previously assessed for land uses that have long since occurred. And, it seems unlikely the parties would have agreed to such an arrangement.

In saying this, we emphasize the difference between *retroactive* and *prospective* adjustment in fees. The Permit clearly gives the Service the right to make *prospective* changes to the rental fee. Indeed, a Forest Service regulation requires each "ski area authorization" to

> include a clause that provides that the Forest Service may adjust and calculate *future* rental fees

to reflect various factors. 36 C.F.R. § 251.57(h) (emphasis added); *cf.* 36 C.F.R. § 251.57(f) (providing for "rental fee adjustment whenever necessary ... as a result of fee review," but providing that "revised fees will take effect at the beginning of the *next* payment year") (emphasis added). But, a prospective change is very different from a retroactive change. It is easy, for example, to imagine the Automobile Registry raising license fees for next year, perhaps even for this year; but, it would be most unusual for such an agency

to raise the license fee for a year that has passed and send drivers a bill for a retroactive surcharge. Thus, we have considered language in the Permit that says, for example, that

> GFA will be established by and changed at the sole discretion of the Forest Service based on the current interpretation of guidelines

as referring to *prospective* changes, as specified in the regulations just mentioned. And, for similar reasons, we shall not interpret the "error" clause, which authorizes *retroactive* change, broadly. That is to say, we do not believe a private party would normally agree that the Forest Service has broad authority to raise rates *after* the event. And, we therefore should not stretch a contract's language to say the party *did* agree to such a condition when that is not what the language says.

## IV

### *The "Judgmental" Error*

■ Given our understanding of the meaning of the words "an error" in the Permit, the Service cannot win this case. That is because Meadow Green is right— the $5,049,853 GFA figure reflected no error at all, or, if there was an error, it consisted of an error in interpreting ambiguous Manual instructions, that is a judgmental error of the kind that we have just said falls outside the scope of the word "error" in the Permit. We reach this conclusion because, after reading the instructions in the Manual with care, we find them unclear on the relevant point, and we do not see how any reasonable person could conclude the contrary.

To understand why this is so, the reader must first understand the Service's basic system for calculating permit fees (called the Graduated Rate Fee System or "GRFS"), as set forth in the Forest Service Manual. That system is designed to impose a "graduated fee," on a ski resort's sales, a fee that increases as does the profitability of a ski resort. To accomplish this result, the GRFS calculates a "break even" point, a point at which sales are large enough to cover most of the resort's varia-

ble costs (*i.e.*, costs other than "fixed" costs). It charges a low percentage fee on "less than break-even" sales, a higher percentage fee on sales between the "break even point" and twice the "break even point," and a still higher percentage fee on further sales. Thus, if, for example, a ski resort's "break even" point were $200,000 in sales, the Service's fee might amount to 1 percent of sales up to $200,000; 3 percent of sales between $200,000 and $400,000; and 5 percent of sales above $400,000.

The Service calculates the "break even" point by a very rough-and-ready rule of thumb, which it apparently applies to all ski resorts whether or not cost conditions at an individual ski resort differ from the norm. (One possible explanation for this ad hoc measure of costs is that the fee is so low that individual cost variations are not likely to make enough difference to warrant the administrative effort needed to take them into account.) That rule first values the resort's investment in fixed assets devoted to generating revenue from the activity in question (such as ski lifts, tows, and ski schools, in the case of ski revenues). The Manual defines this investment—the Gross Fixed Assets, or GFA—as

> The total of the original undepreciated costs (not the present value) of the current permittee's investment in improvements and fixtures plus the cost of equipment necessary to generate sales and other income.

Forest Service Manual § 2715.14c-3. The Manual then simply selects a ratio between sales and GFA (presumably on the basis of typical experience) which it calls the "break even point." In the case of ski investment in lifts, tows and ski schools, for example, the Manual says that 20 percent is the "break even point," which is to say that once sales reach 20 percent of GFA, the resort, according to the Manual, "breaks even." If the resort's original investment in lifts, tows and ski schools was $1 million, the resort reaches its "break even point" when its sales reach $200,000. As we have said, the resort would then pay 1 percent on sales below $200,000, 3 percent on sales between $200,000 and $400,000, and 5 per-

cent on further sales. If the resort instead had invested only $250,000 in lifts, tows, and ski schools, it would pay 1 percent on sales below 20 percent of $250,000 (or $50,000); 3 percent on sales between $50,000 and $100,000; and 5 percent on sales above $100,000.

With this structure in mind, there are two circumstances that favor the Service's view that given the Manual's instructions, the $5 million GFA figure in the Permit was an obvious "error." First, the Manual says, in a section entitled "Determining Gross Fixed Assets," that the GFA is based on the *"permittee's* original investment." Forest Service Manual § 2715.14c–3. It adds that the GFA "includes the original costs *to the current permittee." Id.* The "permittee" (and certainly the "current permittee") in this case is Meadow Green, not its predecessor Wildcat. Wildcat fell on hard times, and Meadow Green bought its assets cheaply. The parties agree that the $5 million dollar figure was *Wildcat's* GFA; were Meadow Green's GFA calculated afresh on the basis of the price it paid for Wildcat's assets, the $3 million figure (we assume) would reflect that cost.

Second, the Manual gives fairly specific instructions and examples designed to tell the Forest Service Officer how to calculate GFA "Upon Sale and Transfer of a Permit." In that situation the new owner's investment in fixed assets will differ from the investment of the seller. The Manual says that the Service officer should then calculate what it would *now* cost to reproduce the physical assets that the new owner has bought. For purposes of making this calculation, the Manual provides a chart—a kind of cost-inflation-index—so that the Service officer need only apply a simple formula which converts the original cost of the assets into today's dollars. (For example, if the prior owner's ski lift, tow and ski school investment was $100,000, and the owner made the investment in 1920, the officer would apply this formula to arrive at a cost in today's dollars of, say, $1 million, which would be the GFA.) The Manual calls this inflation-adjusted figure the "reconstruction cost."

The Manual's examples (which we have put in Appendix B) make clear that when the prior owner sells the resort at a price *higher* than the prior GFA, the new GFA is the *lower* of a) the new owner's actual purchase price and b) the "reconstruction cost." We *think* we understand why this is so. On the one hand, the Service does not want a new owner's GFA to be more than he really paid for the resort; on the other hand, it does not want to allow the new owner's GFA to reflect the prior owner's "good will" rather than simply the cost of the physical assets. (Otherwise, a prior owner of a very profitable resort could sell out, capitalizing the value of future profits, and creating a new, high GFA—and a corresponding high break-even point—that would require application of the Service's lowest percentage fee.) Regardless of the reasons behind these rules, we think these provisions are relatively clear.

The problem for the Service, however, consists of *other* provisions in the Manual that suggest that the Service officer may, or must, calculate the GFA *differently* when a prior owner sells to a new owner at a price significantly *lower* than the prior GFA. For one thing, the Manual is written in language that suggests the Service officer may have a degree of discretion in deciding just how to value the new owner's GFA. It says, for example, that the Service "will *normally* recognize the purchaser of an existing concession as a new permittee," Forest Service Manual § 2715.14c–4, thereby implying that the Service officer might, in special circumstances, not do so. More importantly, that section goes on to say that

> GFA for the new permit which is established at the time the new permit is issued is *either* the (1) original construction cost, (2) original purchase cost, or (3) *previously established GFA,* each adjusted by the costs of construction over the years, plus costs of equipment, and fixtures to indicate the current cost of the plant; not the total business.

(Emphasis added). This language reinforces the notion of some discretionary authority in respect to GFA itself, for it seems to

say that a Service officer might use the "previously established GFA" as the GFA for a new permittee. Two paragraphs later, when the Manual seems to impose a ceiling on a new permittee's GFA, it says

such a [new permittee's] GFA when developed and assigned, in the case of a sale and transfer will not exceed the *purchase price or reconstruction cost.*

This language does not say "purchase price or reconstruction cost *whichever is lower.*" Rather, it seems to leave the choice to the Service officer, or, at least, to the officer as guided by the examples that the Manual provides. Meadow Green asserts (without contradiction) that the $5 million GFA figure in its permit is no higher than the "reconstruction cost" (the historic cost as inflated by the Manual's chart). Thus, as far as the Manual's explicit language is concerned, it seems to authorize the Service officer to use the Permit's $5 million figure.

As we mentioned above, the table of examples itself suggests that the new permittee's "purchase price" sets a ceiling on GFA of "reconstruction cost or purchase price, whichever is lower." But, those examples all involve a purchase price that is *higher than* the prior owner's investment. The only example that deals with a purchase price *below* the prior owner's investment illustrates the exact opposite result. In this example the prior owner's GFA is *carried over.* The example says that the seller's GFA was $100,000, that a "forced sale" realized $50,000 and that the buyer's GFA is $100,000. And, the commentary describes the example as:

Mortgage was foreclosed and sold for $50,000. The full original cost not adjusted to the present date would be allowed.

Forest Service Manual § 2715.14c-7. We recognize that the Wildcat sale to Meadow Green was not an involuntary sale or a mortgage foreclosure and that the Service *now* says that the example is limited to those circumstances. Yet, one reading the example might reasonably conclude that it applies to many low priced sales, or at least to distress sales, sales brought about by

poor business conditions and at a price significantly lower than prior investment.

A reader of the regulations and the examples, aware of the fee calculation's basic theory, might have a particular reason for thinking the "low-price" example applied to many, if not all, low price sales. Recall the ski resort owner who invested $1 million in lifts, tows and ski schools. The fee calculation rules assume that his sales reach the "break even point," at $200,000 (20 percent of GFA). Now suppose this owner, falling on hard times, sells the resort for $250,000. If the new owner's GFA must fall to $250,000, his "break even point" becomes $50,000 in sales. But, is it likely that the variable (non-fixed) costs of operating lifts, tows, and ski schools at this same resort have fallen to only one-quarter of what they were before? Is it reasonable to think that this new owner will "break even" so much sooner than the prior owner (though, of course, his investment is considerably less)? The Manual's system leads a reader to ask this kind of question, and the question itself could suggest a need for an exception to the "purchase price as GFA ceiling" rule, which the example in the Manual would seem naturally to supply.

We do not say the Manual's instruction *must* be read this way. We recognize that the Service has the legal power to write its own instructions and to tell us (within reason) what those written instructions mean. *Cf. Udall v. Tallman,* 380 U.S. at 4, 85 S.Ct. at 795. But, that fact does not make these regulations clear or unambiguous. The Service cannot use administrative law words such as "leeway" and "deference" magically to transform mud into crystal or to characterize as transparent that which, in fact, is opaque.

The Manual's instructions are not clear; they are ambiguous; the Service officer's "error," at most, was an error of interpretation, an "error" of judgment about the meaning of ambiguous instructions. And, for the reasons we have pointed out in Part III, *supra,* the Permit's word "error" does not cover that kind of mistake. Consequently, the Service lacked the legal power to change the GFA retroactively and to

assess, retroactively, an increased fee for the years 1986, 1987, and 1988. We need not consider Meadow Green's claim of estoppel, for this reason is sufficient to demonstrate that the agency's assessment was not "in accordance with law." 5 U.S.C. § 706(2)(A). Its determination must, therefore, be set aside. The judgment of the district court is

*Reversed.*

# APPENDIX A

Selected pages from the Term Special Use Permit

| States Department of Agriculture Forest Service | a. Record No. (1-2) 7 0 | b. Region (3-4) Eastern 0 9 | c. Forest (5-6 White 2 2 Mountain |
|---|---|---|---|
| TERM SPECIAL USE PERMIT | d. District (7-8) Andro 0 2 | e. User No. (9-12) 4007 | f. Kind (13-15 Winter 161 Sports Resort |
| Act of March 4, 1915, Sec. 7 (Ref. FSM 2710) | g. State (16-17) 3 3 | h. County (18-20) Coos 0 0 7 , | k. Card No. (2 1 |

Permission is hereby granted to __Meadow Green - Wildcat Corporation__ of __Pinkham Notch, Jackson, New Hampshire 03846__, hereinafter called the permittee, to use subject to the conditions set out below, the following described lands or improvements for the period of __25__ years from the date thereof:

Approximately 61 acres of portions of U.S. Tracts #16, 31, and 66 lying on the northwest slope of Wildcat Mountain near Pinkham Notch in the White Mountain National Forest as shown on Drawing No. MH-3-296,022 titled "Term & Permit Areas" and also described on two pages numbered M-11-3-302,013 titled "Term Special-Use Permit Area - Description of Tract" both prepared by E.N. Roberts, Engineer, Concord, New Hampshire, and dated "10 Sept. 1962", which drawing and description are attached and made a part of this permit, and drawings 2a, 2b, 2c, and 2d of the Wildcat General Development Site Plan (Master Development Plan) dated October 1976 by Kiley-Tyndall-Walker, which drawings are attached and made a part of this permit.

This permit covers __61__ acres and is issued for the purpose of:

Construction, operation, and maintenance of a year-round outdoor recreational development to provide services necessary and desirable for the reasonable comfort and convenience of the public. Structures, facilities and appurtenant improvements to be authorized by this permit are as shown on the approved development plan as required in Clause 23.0 of this permit.

This permit is supplemented by a terminable (annual) special use permit dated __10/23/86__ for 842 acres for appurtenant improvements, structures, and facilities to be used in conjunction with the privileges granted by this permit.

This permit supersedes a special use permit designated 2720, Wildcat Mountain Corporation, January 10, 1974, Winter Sports Area.

1. Construction or occupancy and use under this permit shall begin immediately. This use shall be actually exercised at least 365 days each year, unless otherwise authorized in writing.

2. SEE CLAUSE 20 FOR FEES

3. This permit is accepted subject to the conditions set forth herein, and to conditions __20__ to __27__ attached hereto and made a part of this permit.

4. Development plans; layout plans; construction, reconstruction, or alteration of improvements; or revision of layout or construction plans for this area must be approved in advance and in writing by the Forest Supervisor. Trees or shrubbery on the permitted area may be removed or destroyed only after the Forest Officer in charge has approved, and has marked or otherwise designated that which may be removed or destroyed. Timber cut or destroyed will be paid for by the permittee as follows: Merchantable timber at appraised value; young-growth timber below merchantable size at current damage appraisal value; provided that the Forest Service reserves the right to dispose of the merchantable timber to others than the permittee at no stumpage cost to the permittee. Trees, shrubs, and other plants may be planted in such manner and in such places about the premises as may be approved by the Forest Officer in charge.

5. The permittee shall maintain the improvements and premises to standards of repair, orderliness, neatness, sanitation, and safety acceptable to the Forest Officer in charge.

6. This permit is subject to all valid claims.

7. The permittee, in exercising the privileges granted by this permit, shall comply with the regulations of the Department of Agriculture and all Federal, State, county, and municipal laws, ordinances, or regulations which are applicable to the area or operations covered by this permit.

8. The permittee shall take all reasonable precaution to prevent and suppress forest fires. No material shall be disposed of by burning in open fires during the closed season established by law or regulation without a written permit from the Forest Officer in charge or his authorized agent.

9. The permittee shall exercise diligence in protecting from damage the land and property of the United States covered by and used in connection with this permit, and shall pay the United States for any damage resulting from negligence or from the violation of the terms of this permit or of any law or regulation applicable to the National Forests by the permittee, or by any agents or employees of the permittee acting within the scope of their agency or employment.

10. The permittee shall fully repair all damage, other than ordinary wear and tear, to national forest roads and trails caused by the permittee in the exercise of the privilege granted by this permit.

11. No Member of or Delegate to Congress or Resident Commissioner shall be admitted to any share or part of this agreement or to any benefit that may arise herefrom unless it is made with a corporation for its general benefit.

12. Except as provided in Clause 16 below, upon abandonment, termination, revocation, or cancellation of this permit, the permittee shall remove within a reasonable time all structures and improvements except those owned by the United States, and shall restore the site, unless otherwise agreed upon in writing or in this permit. If the permittee fails to remove all such structures or improvements within a reasonable period, they shall become the property of the United States, but that will not relieve the permittee of liability for the cost of their removal and restoration of the site.

13. This permit is not transferable. If the permittee through voluntary sale or transfer, or through enforcement of contract, foreclosure, tax sale, or other valid legal proceeding shall cease to be the owner of the physical improvements

**Fees**

**Definitions, Graduated-Rate Fee System**

For purposes of recording and reporting sales, and sales related information including cost of sales, the activities of the concessioner are divided into:

**Service, Food.** Includes the serving of meals, sandwiches, and other food materials either consumed on the premises or prepared for carryout. Snack bars are included here, as well as the sale of nonalcoholic drinks and beer served in conjunction with food.

**Merchandise:** Includes the sale of miscellaneous clothing, and such items as hardware, souvenirs, and gifts. Bait, fishing rods, reels, boats, motor and boating accessories are included as well as other sporting equipment and clothing sales. Where a "Service, Car" category of business is not established by this permit, the sale of auto accessories in included in this category.

**Rental and Service:** Includes the rental of ski and snow play equipment.

**Lift, Tow, and Ski Schools.** Includes charges for use of all types of uphill transportation facilities and for sports lessons and training.

1. **Gross Fixed Assets (GFA)** The total capitalized cost of improvements, equipment, and fixtures necessary and used to generate sales and other income during the permit year on the permitted area or within the development boundary shown in this permit.

   GFA will be established by and changed at the sole discretion of the Forest Service based on the current interpretation of guidelines supporting the Graduated Rate Fee System."

a. Costs of the following items verified by a representative of the Forest Service to be in existence and use by the holder are included:

   (1) Identifiable structures, major equipment, such as road maintenance equipment, or land improvements which play a distinct role in generating sales.

   (2) Identifiable holder costs to provide utility services to the area. Utility services that extend beyond the development boundary may be included in GFA to the extent they are necessary for the generation of sales and are paid by the holder.

b. Such items as the following are not a part of GFA:

   (1) Assets that ordinarily qualify for inclusion in GFA, but which are out of service for the full operating year for which fees are being determined.

   (2) Land.

   (3) Expendable or consumable supplies.

f.  Value of sales where the holder is serving as a collection or sales agent for businesses not directly associated with the permitted operation. This includes such things as bus or sightseeing-ticket sales for trips not related to activities on the permitted area, telephone-toll charges, and accident-insurance sales.

g.  Items listed in a policy statement prepared by the holder pertaining to gratuities previously approved in writing by the Forest Supervisor. The policy statement will describe how gratuities are to be recorded. A record of all gratuities shall be kept by the holder as a part of the records under this permit.

h.. Franchise receipts. Defined as amounts paid the holder by sublessees, as determined at the time franchise operations are authorized, solely for the opportunity to do business at a specific location, possibly in addition to a stated rental fee. Franchise receipts may be in the form of fixed amounts of money or reduced prices for the franchiser's product or service. No franchise operations will be undertaken until approved, in advance, by the Forest Supervisor.

i.  Commission payments received by the holder for serving as an agent or providing services such as those described in items e and f above.

## 20.2    Other Stipulations (Graduated-Rate Fee System)

The annual fees due the United States for those activities authorized by this permit shall be calculated on sales according to the schedule below.

| Kind of Business | Break-even point (Sales to GFA) (Percentage) | Rate Base (Percentage) | Balance of Sales Rate (Percentage) |
|---|---|---|---|
| Service, food | 70 | 1.25 | 1.50 |
| Merchandise | 70 | 1.50 | 1.80 |
| Rentals and Services | 30 | 4.50 | 5.95 |
| Lifts, Tows, and Ski Schools | 20 | 2.00 | 5.00 |

A weighted-average break-even point (called the break-even point) and a weighted-average rate base (called the rate base) shall be calculated and used when applying the schedule to mixed business. If the holder's business records do not clearly segregate the sales into the business categories authorized by this permit they will be placed in the most logical category. If sales with a different rate base are grouped, place them all in the rate category that will yield the highest fee. Calculate the fee on sales below the break-even point using 50 percent of the rate base. Calculate the fee on sales between the break-even point and twice the break-even point using 150 percent of the rate base. Calculate the fee on sales above twice the break-even point using the balance of sales rate.

(4) Intangible assets, such as goodwill, organization expense, permit value, and liquor licenses.

(5) Improvements not related to the operation.

(6) Luxury improvements not used to generate sales.

(7) Improvements not located on the permit sites within the development boundary (except for utility identified in (2).)

(8) Expensed assets.

(9) Assets owned by and leased from others.

As of April 30, 1986 the initial GFA under this ownership has been determined to be $5,049,853 as shown in detail on attached schedule, 1, "Gross Fixed Assets". If an error is found in the GFA amount, it shall be changed to the correct amount retroactive to the date the error occurred.

2. Sales For the purpose of fee calculation include (1) revenues derived from all goods and services sold which are related to operations under this permit and (2) the value of gratuities not excluded by item g. Gratutities include such goods, services, or privileges as discounts, gifts, dividends, or benefits that are furnished to such individuals as stockholders, owners, creditors or other obligees, officers, employees or their families, at rates or under conditions not available to the general public. Such gratuities shall be sales-priced by the Permittee at the current price to the public.

The following items shall be excluded from gross receipts or revenue to arrive at sales:

a. Refunds from returned merchandise and receipts from sales of real and nonrental personal property used in the operation. Sales of property, such as rental equipment, previously used for generating operating revenue, when sold on the premises, shall be included in gross receipts. Examples of this are such rental items as boats, motors, skis, or boots, which may be sold periodically and replaced. If such equipment is traded in or sold off premises, the value or revenue shall be excluded from sales.

b. Rents paid to the holder by sublessees, even if based on sales. (The gross sales of sublessees are included as provided under item (1).)

c. Amounts received for goods sold, services rendered, or privileges granted at a price lower than the holder's current price to the public. (The full value is included as provided under item (2).)

d. Sales taxes and Federal and State gasoline taxes collected from customers that were paid or are payable directly to taxing authorities.

e. Amounts paid or payable to a Government licensing authority or recreation administering agency from sales of hunting or fishing licenses and recreation fee tickets.

26L14 This permit supersedes a special-use permit designated: <u>Winter Sports Resort. Wildcat Mountain Corporation. dated 1/10/74</u>.

.15 <u>Permit Termination</u>

Unless sooner terminated or revoked by the authorized officer, in accordance with the provisions of the authorization, this authorization shall expire and become void on <u>July 31, 2006</u>, but a new special-use authorization to occupy and use the same National Forest System land may be granted provided the holder will comply with the then-existing laws and regulations governing the occupancy and use of National Forest lands and shall have notified the authorized officer not less than <u>30 days</u> prior to said date that such new authorization is desired.

27.0 <u>Supplemental Permit</u>

This permit is supplemented by a terminable (annual) special use permit dated _____ for 842 acres for appurtenant improvements, structures, and facilities to be used in conjunction with the privileges granted by this permit.

<u>ACKNOWLEDGMENT</u>

This Permit will have no force and effect until the permittee has signified acceptance of its provisions and conditions by signing below and returning the duplicate copy to the Forest Supervisor.

U.S. DEPARTMENT OF AGRICULTURE
FOREST SERVICE

_____10/23/86_____
Date

_MICHAEL B. HATHAWAY_
MICHAEL B. HATHAWAY
Forest Supervisor

The undersigned authorized official of Meadow Green - Wildcat Corporation has read the foregoing permit and agrees for and in behalf of said corporation that it accepts and will abide by its terms and conditions.

_____10/23/86_____
Date

<u>Meadow Green Wildcat Corporation</u>

By_____.

Title_____

I, _____, certify that I am the Secretary of the Meadow Green-. Wildcat Corporation named as permittee herein; that _____. who signed said permit on behalf of said corporation, was then _____ of -td corporation that said permit was duly signed, for and in behalf of said corporation authority of a resolution adopted by its Board of Directors on the _____day _____, 19__.

(SEAL)

_____
Secretary

## APPENDIX B

Selected pages from the Forest Service Manual

2715.14c--4

### TITLE 2700 - SPECIAL USES MANAGEMENT

*-    b.  Include language in permits and disallow existing or
new expensed and expensed leased assets (operating leases) in
GFA in all new permits; renewal of existing expired permits;
and when amending existing permits to authorize major expan-
sions and capital investment, boundary modifications, or other
significant changes in the authorizations (FSH 2709.11. sec.
53.1).

c.  GFA will change annually, as appropriate, at the time
of fee calculation to recognize additions, deletions, or
capitalized modernization.  Require holders to submit documen-
tation of such changes along with their annual operating
statement.

d.  Sample GFA Determinations.  There follow a timespread
table, or chart, demonstrating graphically the setting of GFA
in 13 representative situations, and some notes explaining the
actions indicated by the chart.

The table represents a hypothetical time interval between the
"START" (sometime in the past and "NOW.")  There are 14 hori-
zontal lines on the chart extending from the "START" of the
time interval until the end (NOW).  The top line indicates
that during the time interval the cost of construction, as
indicated by the Department of Commerce Construction Cost
Index, increased by 50 percent; for example, it would cost
$150,000 NOW to replace an item which has been fully
maintained and which was constructed at the START for
$100,000.

The next 13 lines represent the life histories of 13 different
but representative permit situations.  Indicated are construc-
tion cost, change of ownership, losses, additions, and
modernizations--all things that might affect GFA.  Some basic
assumptions are that (a) acceptable cost records are
available, (b) the original cost in each situation is the
same, $100,000, and (c) all normal necessary maintenance has
been carried out.

In the example, the permits are coming under GRFS NOW for the
first time because of periodic fee review, issuance of a new
permit after termination of a previous one, or a new permit is
being issued as a result of sale of the improvements.  It is,
therefore, necessary to establish GFA for the first time for
each of the situations.

*-FSM 12/86 AMEND 89-*

## TITLE 2700 - SPECIAL USES MANAGEMENT

**DETERMINING GFA IN REPRESENTATIVE SITUATIONS**

| SITUATION | START | TIME SPREAD — Increased value, per Const. Cost Index → | NOW | GFA |
|---|---|---|---|---|
| 1. | $100,000 | | Sale -0- $150,000 | $150,000 |
| 2. | 100,000 | | Sale -0- 120,000 | 120,000 |
| 3. | 100,000 | Sale -0- 80,000 | Sale -0- 120,000 | 120,000 |
| 4. | 100,000 | | Sale -0- 200,000 | 150,000 |
| 5. | 100,000 | | | 100,000 |
| 6. | 100,000 | Expansion + 50,000 | | 150,000 |
| 7. | 100,000 | Expansion + 100,000 | Fire Loss - 50,000 | 150,000 |
| 8. | 100,000 | Sale -0- 120,000 ... Sale -0- 150,000 | | 150,000 |
| 9. | 100,000 | Forced Sale -0- 50,000 | | 100,000 |
| 10. | 100,000 | Sale -0- 75,000 ... Sale -0- 50,000 | Sale 100,000 | 100,000 |
| 11. | 100,000 | Sale -0- ... Sale 150,000 ... Sale -0- | Sale -0- 100,000 | 150,000 |
| 12. | 100,000 | Expansion 120,000 ... Expansion 50,000 ... 180,000 | Sale 200,000 | See Narrative |
| 13. | 100,000 | Fire Loss 100,000 ... 25,000 ... 30,000 ... Improvement 50,000 ... 75,000 | -0- 200,000 | See Narrative |

FSM 12/86 AMEND 89

2715.14c--6

# TITLE 2700 - SPECIAL USES MANAGEMENT

**Situation 1.** Sold now for $150,000. Construction Index shows today's cost at $150,000, so full credit is given for the sale price and GFA is pegged at $150,000.

**Situation 2.** Sold now for $120,000. Construction Index shows today's cost at $150,000. However, as credit can only be given for actual investment, GFA is pegged at the sale price of $120,000.

**Situation 3.** Sold sometime ago for $120,000. Previous sale of $80,000 has no bearing so GFA is pegged at $120,000, the actual investment of the current permittee.

**Situation 4.** Sold now for $200,000. Construction Index shows today's cost at $150,000. GFA cannot be credited at more than adjusted value regardless of price paid. So GFA is pegged at $150,000.

**Situation 5.** Original developer is still the permittee. $100,000 is all the money he has invested in qualifying GFA items. GFA is, therefore, $100,000.

**Situation 6.** Original developer is still the permittee. He spent an additional $50,000 for expansion. He is credited with the added cost so GFA is $150,000.

**Situation 7.** Original developer is still the permittee. He spent an additional $100,000 to bring total cost up to $200,000. However, he suffered a $50,000 loss and has not yet replaced the destroyed structures. GFA can only reflect actual sales producing items, so GFA is $200,000 less $50,000 or $150,000.

**Situation 8.** Sold some time ago for $150,000. While this is more than it was worth then, it is the permittee's investment and is worth that much now, so GFA is $150,000.

**Situation 9.** Mortgage was foreclosed and sold for $50,000. The full original cost not adjusted to the present date would be allowed.

TITLE 2700 - SPECIAL USES MANAGEMENT

Situation 10.  Sold now for $100,000.  Past sales have no bearing.  Even though the Construction Index indicated today's cost is $150,000, this is $50,000 in excess of today's sale price.  $100,000 is creditable to GFA.

Situation 11.  Sold now for $200,000.  Past record shows sales at progressively higher than the original $100,000 cost.  However, they have no bearing.  As Construction Index value is $150,000 that is all that may be allowed.  GFA is $150,000.

Situation 12.  Sold now for $300,000.  On two occasions, expansion projects were carried out, one of $100,000 and the other $50,000.  In determining GFA the original $100,000 would provide credit of $150,000 today.  The Construction Index change between the date of each expansion and now would be used to determine today's cost of the expansion of added items.  These steps are necessary before it can be determined what part of the $300,000 sale price would be credited to GFA.

Situation 13.  Sold now for $200,000.  GFA today would reflect the initial cost less $55,000 losses with the difference adjusted per Construction Cost Index today.  The $75,000 would be adjusted by the Index change between its date of expenditure and today.  GFA today would then be the sum of the adjusted remainder of original cost plus adjusted cost on the subsequent improvement.