**H. LANDAU & COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 403–86C.**

United States Claims Court.

May 14, 1990.

Ruth E. Ganister, West Chester, Pa., for plaintiff.

Stephen J. McHale, with whom were Asst. Atty. Gen. Stuart M. Gerson and David M. Cohen, Washington, D.C., for defendant.

OPINION

BRUGGINK, Judge.

H. Landau & Company brings this contract action to recover the value of cloth it supplied to Carilee, Inc., a company which had contracted to furnish sleeping bags to the Government. Landau alleges that the Government is obligated to honor what purport to be letters of guarantee of payment executed on behalf of the Small Business Administration ("SBA") by two SBA employees. In reliance on these letters, Landau supplied cloth to Carilee.[1] The court earlier dismissed this action on sum-

---

**1.** Emmanuel Landau is President of H. Landau & Company. All the relevant actions taken on behalf of plaintiff were those of its president. The court will therefore refer both to plaintiff and its president interchangeably as "Landau."

mary judgment, finding that the employees in question, Robert C. Harris and Earl D. Johnson, did not have authority to execute the guarantees. 16 Cl.Ct. 35 (1988). That decision was reversed and remanded by the Federal Circuit for consideration of whether Harris and Johnson had implied actual authority to obligate the United States to guarantee payment to Landau. 886 F.2d 322 (1989). After trial, the court concludes that they did not.

## FACTS

On October 25, 1983, the Defense Personnel Support Center ("DPSC"), a field activity of the Defense Logistics Agency ("DLA"), awarded a contract to the SBA pursuant to section 2[8](a) of the Small Business Act, 15 U.S.C. § 637(a) (1988). The SBA in turn awarded a subcontract to Carilee on October 27, 1983. Under the terms of the subcontract, Carilee agreed to supply 25,000 sleeping bags to DPSC on behalf of the SBA for a total contract price of $3,613,125.00. By a contract modification dated December 12, 1983, SBA provided Carilee with advance financing in the amount of $1,139,000.00. The modification required that advance payments be liquidated through a special joint bank account of Carilee and the SBA at the Pittsburgh National Bank. The amount of advance financing was later increased by $700,000.00.

Withdrawals from the special bank account could only be made over the signatures of both an authorized representative of the SBA and an authorized representative of Carilee. Robert C. Harris and Earl D. Johnson of the SBA District Office in Pittsburgh were designated by the SBA Regional Office in Philadelphia as the authorized SBA countersignatories on the special bank account. The parties have stipulated that Harris and Johnson were required to obtain the approval of SBA personnel in the Philadelphia office before signing any check on the special bank account.

Landau is a textile converter. It buys raw textiles and then has them dyed, printed and finished for shipment to customers.

Landau was aware of the award of the subcontract, and its sales representatives contacted Carilee to offer oxford and balloon cloth. Landau got the order, and agreed to supply cloth subject to credit assurances. Carilee's President, Silverio Rodriguez, told Landau that the SBA would assure payment.

Emmanuel Landau, plaintiff's President, testified to circumstances surrounding the first shipment of cloth to Carilee. Apparently Carilee was unable or unwilling to pay immediately for the first shipment upon delivery. Landau obtained Harris' name from Carilee. He told Harris that Landau's truck, then waiting at Carilee's loading dock, would not unload unless the SBA guaranteed payment. Before considering the evidence with regard to what happened at the Pittsburgh District Office in response to this phone call, some of which is in conflict, the court will address what unquestionably did occur. On January 24, 1984, the day after this conversation, Harris wrote and signed a letter to Landau. The text of the letter is as follows:

> Pursuant to our telephone conversation on January 23, 1984, on Carilee, Inc.[,] the Small Business Administration will guaranty payment on those materials that were ordered for the starting of the contract. The dollar figure discussed was about $250,000[. O]nce invoices are received, payment will follow in a week to ten days. If you have any questions, I can be reached at the above number.

Landau did not meet with Harris on this or any subsequent occasion. Neither during this first conversation nor during succeeding ones did Harris tell Landau that authority had to be obtained from someone else in the SBA.

The contract modification incorporating advance payment provisions had been executed in December 1983. Although the record is not clear as to when advance funds were actually deposited to the joint account, that apparently occurred shortly after Harris' execution of the first letter of guarantee. Harris knew that the account itself had been set up the previous Novem-

ber. On January 20, 1984, Ellis wrote the Pittsburgh National Bank advising that advance payments had been approved and would be deposited. On January 23, the Pittsburgh Office District Director wrote Harris notifying him of his and Johnson's designation as account signatories. On January 25, Ellis wrote the DPSC advising it that advance funds had "been approved."

Landau shipped two lots of cloth to Carilee on January 23 and 25, 1984. Its invoices, in the amounts of $104,905.02 and $124,918.98, were paid in full by checks drawn on the special bank account. On three subsequent occasions, Landau requested and got from Harris, or from Johnson,[2] Harris' assistant, documents purporting to be letters of guarantee. The three later letters, dated June 18, 1984, June 26, 1984, and August 17, 1984, varied somewhat from the first letter. The June 18 letter is representative:

> Pursuant to our phone conversation on June 18, 1984 about Carilee, Inc., Connellsville, PA, the Small Business Administration through its Advanced Payments Account and based on progress payments received will guarantee the payment of $110,000 for the purchase and delivery of cloth material. Payment will be made 60 days after receipt of invoice.

The total amount guaranteed by the letters was $629,759.78. Landau testified, and the court believes,[3] that plaintiff would not have shipped the materials without the letters. Landau delivered cloth worth $390,970.08 to Carilee. It was paid $266,568.75, and thus remains unpaid in the amount of $124,401.33. It is undisputed that DPSC received from Carilee the sleeping bags for which it had contracted. It is also undisputed that the DPSC, acting through the SBA, paid Carilee the entire contract amount.

Insofar as is relevant here, defendant put on testimony concerning the organization of the SBA in general, and, in particular, with respect to the Minority Small Business and Capital Ownership Development Program ("MSB & COD"). Overall responsibility within SBA for the area which includes Pittsburgh rests with Region III, headquartered in Philadelphia. That regional office, in turn, oversees seven district offices, one of which is the office in Pittsburgh. Testimony on this issue, as well as the functions of the various offices and individuals, came primarily from Delores C. Ellis. Ellis is the Assistant Regional Administrator for Minority Small Business and Capital Development in Region III. With respect to minority small business activities, the district directors throughout the region, as well as a number of individuals in the Philadelphia office, reported directly to Ellis. Much of her testimony consisted of explanation of the Standard Operating Procedure ("SOP") in effect for the MSB & COD.

The court was impressed with Ellis' knowledge, not only of the SOP in effect during the relevant period, but also of how and why it was developed. She spoke with authority and from first hand information about all MSB & COD activities in Region III. The court notes by way of initial summary observation, that none of her statements were contradicted in any way by plaintiff, and that her explanation of the respective responsibilities and authorities of offices and individuals left no room for implied actual authority in Harris and Johnson to issue letters of guarantee.

Ellis explained that the SBA undertakes two distinct types of activities with respect to section 2[8](a) businesses, and that this dichotomy is preserved in the organization of the MSB & COD program. One of SBA's functions is development of minority businesses. As Ellis explained it, "the business development function ... has nothing to do with contracts. [Its purpose is] to help that firm to develop; provide management and technical assistance if they need it; help them market their capa-

---

2. Johnson's actions were taken with Harris' authorization. If Harris' actions were unauthorized, it follows that Johnson's actions also were.

3. Defendant attempted to challenge the credibility of plaintiff's President by showing that he was convicted of wire fraud in violation of 18 U.S.C. § 1343 (1988). The court found Emmanuel Landau to be a credible witness, however.

bilities with private concerns or with other Government agencies." These activities are implemented in the district offices by "Business Development Specialists," such as Harris and Johnson. The other aspect of SBA's activities with minority businesses relates to the subcontracting, to minority businesses, of contracts to provide goods and services to other government agencies. Those activities are carried out in either the Philadelphia Regional Office or in some of the local district offices by Contracting Officers or "Contract Specialists."

The Pittsburgh District Office of the SBA is one of two district offices in Region III which does not have contracting authority. Unlike other district offices to which contracting responsibilities have been delegated, Pittsburgh was not given authority by the SOP to "[d]elegate[ ] subcontract administration responsibilities to the procuring activity, as appropriate," or to "[n]egotiate, execute[ ] and administer[ ] 8(a) contracts and subcontracts." Pittsburgh was specifically not allotted a Contracting Officer or Contract Specialist position. For district offices that do have contracting authority, the SOP provides that the:

> Contract Specialist is responsible for carrying out activities in connection with negotiation, follow-up and maintenance of all documentation pertaining to contract and subcontract awards. Activities shall include negotiation of prices with procuring activities and participating firms; review of Prime Contract documents and work related to assignment of subcontracts;
>
> .    .    .    .    .
>
> The Contract Specialist shall also be responsible for contract administration of all contracts, grants, and agreements as it relates to 7(j)1–10, and Agency SOPs and regulations.

General contract functions for the Pittsburgh office were all handled in Philadelphia. During the time in question, Melvin Hamilton, an employee in the Philadelphia office, acted as Contract Specialist for Pittsburgh, as could Ellis herself. No one in the Pittsburgh district office, including Joseph M. Kopp, District Director, had authority to enter into a contract.

The subcontract in question recited that responsibility for its administration had been delegated to the DLA office in Pittsburgh. That delegation in turn was carried out by the Defense Contract Administration Service Management Area ("DCAS-MA"). As Ellis explained, DCASMA's functions were the day to day oversight of contract performance to ensure quality delivery from Carilee. This included monitoring production, insuring quality, and final acceptance. The only administrative functions for which initial responsibility lay with the SBA was that of overseeing the advance payment account created to provide start up funds to Carilee. The SBA also retained authority, however, to deal with termination for default or convenience, and to deal with disputes.[4] Under normal circumstances, only if significant problems arose would SBA have any day-to-day involvement other than with the advance payment account.

Harris' official position description was entitled, Supervisory Business Development Specialist, GS–1101–13. His organizational title within the Pittsburgh district office was Assistant District Director for Minority Small Business and Capital Ownership Development. Both Harris and Ellis testified that his duties in practice were the same as those outlined in the position description. Harris' overall task was to foster minority business in the Pittsburgh area by helping such businesses market themselves, primarily to government vendors. Some of his specific duties were to plan, direct and supervise MSB–COD activities, determine the status of programs, assure that effective assistance was provided to socially disadvantaged business concerns, and represent the SBA to the minority business community, government agencies and other business entities. Har-

---

**4.** There is no contention that the actions of Harris and Johnson could be supported by the    delegation to DCASMA.

ris explained that his responsibilities were to oversee minority business development programs, not to oversee contract performance. His contacts with minority businesses were totally independent of whether a particular business had a contract with the Government. The only contract duties he had were to maintain any advanced payment accounts being administered by the district office.

Johnson's official position description was entitled Business Development Specialist, GS–1101–12. The substantive aspects of his work were identical to those of Harris, without any supervisory duties.

Advanced payment accounts were sometimes, though not often, set up to assist a minority business contractor at contract startup. Requests for creation of such an account come from the section 8(a) contractor. In the case of Pittsburgh, approval had to come from the regional office. Monies would be deposited in a joint bank account from which payments could be made to assist in initial costs for materials, equipment and labor. When the procuring agency made payments for deliveries, those monies would be used to offset previous advances. In the case at bar, the special joint account was opened on behalf of Carilee and the SBA jointly. Checks had to be cosigned by an authorized representative of Carilee and either Johnson or Harris. Requests for payment from the account were initiated by Carilee. Usually Harris would be notified by telephone in advance that Carilee wished to make a withdrawal. Harris would prepare a form requesting authority to sign the necessary check. When Carilee submitted an invoice, Harris typically would sign the request form indicating the purpose of the expenditure and recommending approval. The form along with attached invoice would then be routed through the District Director. Harris would then send a facsimile copy of the signed request to Region III. Ellis testified that her office was prepared to re-

spond virtually immediately to such requests. Approval normally was obtained in a couple of hours. Harris and Johnson both testified that they understood that no payment could be made without Region III approval. In fact, they did not have authority even to deny a request on their own. They could recommend against payment, but still had to forward the request to Philadelphia.

One of Johnson's functions was to keep a ledger for the advanced payments account. On the ledger, Johnson initially recorded the amount to be advanced to the contractor, and broke out by general categories the way those funds would be used. As checks were written, Harris applied those payments to the projected withdrawals by category. The ledger also included a schedule for recoupment from progress payments of sums advanced by SBA. Harris would record on the ledger the amounts recouped from the purchasing agency. The SOP required that the balance of advance payments at any given point could not be released unless the SBA had received its scheduled paybacks.

As discussed above, Harris and Johnson also had authority to cosign checks on the Carilee special joint bank account. When asked if he had any other duties related to the Carilee contract, Harris was unable to recall any. Both Harris and Johnson were clear in their understanding that they had no contractual authority, and that contracting officer or contracting specialist functions were retained exclusively in Philadelphia with Mel Hamilton or Dorothy Ellis. Harris testified that he understood that if a problem arose with payment of a supplier, it was the contracting officer's responsibility to see that the supplier was paid.[5] Both Harris and Johnson testified that they understood that they had no authority to obligate the United States to pay anyone.

In sum, Harris and Johnson were delegated the responsibility to administer the

5. Harris became involved in resolution of a dispute between DLA and Carilee regarding the quality of 4,000 sleeping bags which DLA initially refused to accept. Although the record is not entirely clear how that dispute was resolved, it is apparent that Harris understood that amendments to the contract, if needed, would have to be approved by the regional office, and that the regional office did in fact exercise final approval over resolution of that dispute.

advance payment account. They had no other contract-related duties. Their primary responsibilities remained those of business development.

There is an obvious dissonance between what Harris and Johnson understood to be the limitations on their authority, and what they attempted to do in issuing letters of guarantee. As will be discussed in more detail below, the court is satisfied that Harris' and Johnson's actions were in no way prompted by any ambiguity about their authority, or by a reasonable construction of their responsibilities. And while no explanation is required for this dissonance, the court is persuaded that a relatively simple explanation exists. Harris and Johnson apparently were of the view that the letters they issued to Landau purporting to guarantee payment for deliveries to Carilee, while not within their independent authority, were an accurate statement or prediction concerning what would probably occur. They believed that the letters were not in fact an unconditional guarantee. The last three letters illustrate their impression. The letters recite that Landau would be paid "based on progress payments received." Harris understood that Landau could not be paid unless there were sufficient funds in the special account, not obligated to the SBA. Johnson testified that he understood at the time of the letters that if there were insufficient funds in the account to both reimburse SBA for its advance payments and to pay Landau, that Landau would not be paid. That is ultimately what occurred.

Considerably more troublesome for the court, however, is Harris' explanation for what occurred when Landau initially asked for a letter of guarantee. He testified that he knew that authority for a guarantee would have to come through Region III. He states that he had a meeting with Joseph Kopp, the District Director, in which Harris put the problem to Kopp. There was discussion, according to Harris, concerning the need for regional approval. Although Harris does not make this clear, he is apparently asserting the occurrence of two conversations, with some hiatus between. Harris testified that at some point

Kopp told him to issue the letter. During one of these conversations, Harris explained, Mary Merman, District Counsel for SBA in Pittsburgh, came into the room and also approved the use of a letter of guarantee. Harris said that he assumed Kopp had gotten regional approval. Kopp and Merman are adamant, however, that no meeting or meetings ever took place at which letters of guarantee were discussed. They both testified that they understood that a letter of guarantee would be improper without regional approval, and that any such conversation would have been significant enough that they would not have forgotten it.

It is plain from the testimony of Harris, Kopp and Merman that both versions of the facts cannot be true. The nature of the difference is such that it cannot be attributed to confusion. Either Harris' version or that of Kopp and Merman is false. Resolution of this credibility issue is not essential to the outcome, however, since plaintiff does not and could not contend that Kopp and Merman had authority, implied or express, to approve letters of guarantee. Because plaintiff has relied on the incident, however, the court will explain why it disbelieves Harris' account. First, the testimony of Kopp and Merman was persuasive. Although Kopp was relatively new to his position at the time in question, he struck the court as knowledgeable, serious, and genuinely surprised at the idea that Harris contends the meetings occurred. Merman has been District Counsel in the Pittsburgh office for 28 years. She impressed the court as a highly competent, no-nonsense professional who would not hesitate to reject a proposal which she knew to be unauthorized. Harris, by contrast, was less precise and emphatic in his testimony. He paused frequently and his explanation of the meeting or series of meetings lacked the detail one would expect given the conflict in testimony. The court finds that Kopp and Merman never discussed the letters of guarantee with Harris.

It is also noteworthy that Harris does not contend that he notified the regional

office of the guarantees. He submitted monthly reports to Philadelphia, but admits that he never discussed the guarantees, even though he considered a letter of guarantee to be "unusual." Although there were regional office visits to the district office, the record is totally insufficient to find that Ellis or one of her subordinates saw or should have seen the letters to Landau.[6] In short, insofar as relates to the approval of other government officials, Harris' and Johnson's actions were completely independent.

## DISCUSSION

In its remand, the Federal Circuit directed the court to consider "whether Harris and Johnson had the implicit authority to obligate SBA to guarantee the payments." 886 F.2d at 324. The court pointed to the possibility that the actual authority of Harris may have been such, under the circumstances, that it carried with it an implied authority to issue letters of guarantee. 886 F.2d at 324, *citing Branch Banking & Trust Co. v. United States*, 120 Ct.Cl. 72, 98 F.Supp. 757 (1951); *United States v. Bissett–Berman Corp.*, 481 F.2d 764 (9th Cir.1973). In remanding, the court found the following to be relevant:

> The SBA–Carilee subcontract required Carilee to treat requests from the Pittsburgh DLA office as if issued by the SBA and granted responsibility for the subcontract's administration to that office. Part of that responsibility certainly included the duty to see that the subcontractor acquired the necessary raw materials to fulfill its obligation under the contract. That duty, coupled with the authority to draw checks on the joint bank account, may have carried with it the implicit authority to assure suppliers that they would be paid for providing the materials.

*Id.* The record at summary judgment also included Harris' affidavit testifying that Kopp and Merman had authorized the letters of guarantee. This datum was discussed in the remand order. After trial, these issues preventing summary judgment must be resolved in a way that precludes a finding of implicit actual authority.

Initially, as discussed above, the court finds that Kopp and Merman did not meet with Harris to consider the letters of guarantee. They certainly did not direct him to issue them. Other possible indicia of implied actual authority can also be eliminated.

In the remand order, the court points to the following statement in J. Cibinic & R. Nash, *Formation of Government Contracts* 43 (1982): "Authority to bind the Government is generally implied when such authority is considered to be an integral part of the duties assigned to a Government employee." The court is satisfied after a careful examination of Harris' position and activities that the authority to issue letters of guarantee was not an "integral part" of his duties. It was not his responsibility to assure that the contract was performed. To the extent that responsibility rested with any entity other than Carilee, it rested with DCASMA, which did not issue or approve the letters of guarantee. With respect to the role of the DLA and DCASMA, it is apparent that the procuring agency had day to day responsibilities regarding performance of the contract. Those responsibilities related to contracts with Carilee—to ensure timely delivery of sleeping bags that met contract specifications. The responsibility for contract administration remained with SBA, in the Region III office in Philadelphia. In any event, plaintiff did not attempt to demonstrate that implicit in DCASMA's administrative role was the obligation or authority to assure payment to suppliers. More importantly, plaintiff does not contend that DCASMA had any role in issuance of the letters of guarantee. Landau does not suggest that it relied on the actions of DCASMA employees. Nor could it, since Landau's contacts were with Harris, an SBA employee. Nor is there any basis for finding that any of the procuring agen-

---

**6.** Evidence was introduced that Harris wrote letters to three other suppliers purporting to guarantee payment in connection with the Cari-
lee contract. There was no indication, however, that any other SBA officials knew or approved of those letters.

cy's day-to-day responsibilities somehow expanded Harris' authority, which was limited to monitoring the special bank account and recommending payments from it.

Plaintiff's primary contention is that Harris, acting for the SBA, had authority to bind his agency. The record is clear, however, that the authority to issue letters of guarantee was not remotely within a fair reading of Harris' function, as he well knew. Virtually all of Harris' duties involved promotion of minority businesses in a general or programmatic sense. The only duty he had in connection with contract administration was to monitor special joint accounts and to *recommend* whether payments should be authorized to the credit of a contractor. Harris' role with respect to signing checks was purely ministerial. There was no confusion in the regional office or the district office concerning whether he could sign a check without regional approval. He could not. That function, therefore, does not constitute a factor suggesting implied authority. Nor can it be argued that Harris' activities were ratified by authorized personnel within the SBA. There would be no support in the record for such a contention. Nor is there any basis for finding that the organizational and procedural restraints imposed on Harris were compromised in practice by authorized personnel within the agency.

Plaintiff is left with the following facts: Harris' primary job responsibilities involved marketing of qualified minority businesses. His only contract-specific duties were purely ministerial. He was specifically prohibited, as he knew, from obligating the SBA by contract. Carilee represented to plaintiff, one of its suppliers, that the SBA would assure payment for deliveries, and suggested that Landau contact Harris when Carilee could not pay for the first shipment of cloth. Harris felt pressured by Landau to find a way to break the impasse created by Landau's refusal to deliver cloth without payment or a guarantee. The advance payment account had apparently not yet been funded. At Landau's suggestion, and without any authority or approval, Harris executed a purported letter of guarantee. It is notewor-

thy that the SBA had specifically attempted to prevent such circumstances, or at least minimize their disruptive possibilities, by permitting contract suppliers to draw from special advance accounts. By that device, a cash-strapped contractor could use Government monies to commence work before the procuring agency made any payments. There was no need for Harris to accede to Landau's pressure when a mechanism existed whereby Carilee could have obtained funds to pay suppliers using borrowed funds. Although there might have been some delay while funds were deposited to the advance payment account, and perhaps Landau would have refused to immediately deliver, there was nothing approaching an emergency which would have cloaked Harris with extraordinary powers. Although it is unfortunate that Landau furnished goods for which it was never paid, that payment was due from Carilee, not the Government. The Government paid the full amount owed on the contract. Under these circumstances, Harris did not have implicit actual authority to bind the Government.

## CONCLUSION

The Clerk is directed to dismiss the complaint. No costs.