**SON BROADCASTING, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 98–115C.

United States Court of Federal Claims.

July 11, 2002.

Stephen M. Clarke, McLean, VA, for plaintiff. With him on the briefs was A. Wray Fitch III.

Matthew P. Reed, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendant. With him on the briefs were David W. Ogden, Assistant Attorney General, David M. Cohen, Director, and Kathryn A. Bleecker, Assistant Director. Jeffrey Vail, United States Department of Agriculture, of counsel.

## OPINION

WILSON, Judge.

This case is before the Court on defendant's supplemental motion to dismiss and cross-motions for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). For the reasons discussed below, defendant's motion to dismiss and for summary judgment is denied. Plaintiff's cross-motion for summary judgment, more accurately styled a motion for partial summary judgment, is granted.

## BACKGROUND

This case involves an alleged contract between plaintiff, Son Broadcasting, Inc., a television broadcasting company based in Santa Fe, New Mexico, and defendant, the United States, through the Forest Service of the Department of Agriculture. The dispute concerns the development of mountain-top broadcasting towers in Santa Fe National Forest.

On April 27, 1983, Forest Supervisor James Perry approved an "Electronic Site Management Plan" (Site Plan) for the Peralta Ridge Communications Site in Santa Fe National Forest, New Mexico. The Site Plan set out specifications for the development of two broadcasting towers and accompanying

facilities on Peralta Ridge. The Forest Service expressed its goal in the Site Plan to "[m]aximize the number of compatible electronic uses on a minimum site area by authorizing ... two antennae towers initially, with an option for a third tower upon approval by the Forest Supervisor." (Def.'s App. at 3.)[1] Accordingly, the Site Plan provides that "[a] third antenna tower which may be self supporting may be authorized when the technical capacity of the intial [sic] two towers is reached." (Def.'s App. at 5.) The Site Plan authorized a permit allowing plaintiff to construct one of the two initial towers up to a height of 300 feet, and a building to house related equipment. (Def.'s App. 5, 6.) Plaintiff was required to construct a tower and building capable of accommodating plaintiff's antenna and equipment and the additional antennae and equipment for two or more FM radio stations. (Def.'s App. at 6; Def.'s Proposed Findings of Material Fact at 1.) Plaintiff was also required to help finance construction of an access road, power line, and other developments on the site. (Def.'s App. at 6.) The Forest Service reserved the right "to authorize additional users on the site, building, or antennae tower of the holder provided that such use does not unreasonably interfere with the holders [sic] operations." (Def.'s App. at 3.) A permittee whose improvements were so used was entitled to reasonable compensation. (Def.'s App. at 3, 8.)

On October 8, 1982 (prior to the formal adoption of the Site Plan), Forest Supervisor Perry sent a letter to Philip Green, a representative of the Peralta Ridge Users Association, of which plaintiff was and continues to be a member. The letter responded to concerns the Association had expressed regarding the Site Plan. Perry's letter explained that towers on the Peralta Ridge Site "must be structurally capable of handling other user's [sic] facilities as specified in this letter and the site management plan." (Def.'s App. at 35). Perry also reinforced the Forest Service's "intention ... to maximize use of a single building complex and two antenna tow-

---

1. "Def.'s App." references the appendix to Defendant's Motion for Summary Judgment. "Pl.'s App." references the appendix to Plaintiff's Op-

position to Defendant's Motion for Summary Judgment.

ers," and explained that "[a] third tower for additional FM's will only be considered when placement on the first two towers is technologically infeasible and economically unreasonable as compared to the cost and impacts of a third tower." (Def.'s App. at 35.)

On August 25, 1983, in accordance with the Site Plan, the Forest Service issued a "Special Use Permit" (1983 Permit) authorizing plaintiff to construct, maintain, and rent space on its antenna tower. The 1983 Permit was signed by Robert Quade, Acting Forest Supervisor at the time. "In consideration for this use," the 1983 Permit required plaintiff to pay an annual fee based on the value of its structures and a percentage of its income received in rent from additional users. (Def.'s App. at 13.) The 1983 Permit also stated that the Forest Service agreed not to issue authorizations to additional users until arrangements for payment of a fair share of the original development costs were made. (Def.'s App. at 20.)

The 1983 Permit was renewed in 1994 in a separate document entitled "Special–Use Permit for Communications Uses" (1994 Permit), and signed by John Peterson on behalf of Forest Supervisor Alan Defler. Both the 1983 and 1994 Permits incorporate the Site Plan by reference. The 1994 Permit states that it "is issued for the purpose of managing and operating communications uses on the site in accordance with the conditions of this authorization and communications site plan which is attached to and made part of this authorization." (Pl.'s App. at 1.) The 1994 Permit further states that "[a]ll development, operation, and maintenance … shall be in accordance with the communications site plan specifications and stipulations approved by the authorized officer prior to beginning such activity." (Pl.'s App. at 4.)

The 1983 Permit provides that it is revocable and "may be terminated upon breach of any of the conditions herein or at the discretion of the regional forester or the Chief, Forest Service." (Def.'s App. at 11, 12.)

However, the terms of the 1994 Permit no longer reserved the right of the Forest Service to terminate the Permit solely at its discretion. Rather, the 1994 Permit provides that the Permit may be terminated only for "(1) noncompliance with applicable statues, regulations, or terms and conditions of the authorization; (2) for failure of the holder to exercise the rights and privileges granted; (3) with the consent of the holder; and (4) when, by its terms, a fixed agreed upon condition, event, or time occurs." (Pl.'s App. at 2.) Both the 1983 and 1994 Permits also state that they are "not transferable." (Def.'s App. at 11, 12; Pl.'s App. at 2.)

In June 1996, a third party, Plaza Mountain Broadcasting, Inc. (Plaza), applied to the Forest Service for a permit to place two FM antennae on plaintiff's tower and entered into negotiations with plaintiff. An expert hired by Plaza concluded that plaintiff's tower was "adequate for the proposed loading changes" and would "meet the design criteria specified." (Pl.'s App. at 30.)[2] Plaza filed a Special Use Application with the Forest Service seeking permission to place antennae on plaintiff's tower. One month later, however, Plaza ended negotiations with plaintiff after learning that the Forest Service was willing to authorize construction of a third tower at the Site. Plaza made arrangements to place its antennae on a third tower to be constructed by Journal Broadcasting, Inc., the owner of the second of the original two towers. The Forest Service approved construction of the third tower, over plaintiff's objections, in October 1996. The Forest Service Decision Memo concluded that "current space is not available on Journal Broadcasting's tower for additional antennas, a new tower will have to be constructed to accommodate the demand, as provided in the Peralta Ridge Electronic Site Management Plan," and later, that construction of the third tower "would provide space currently not available at the site for additional FM broadcasting." (Def.'s App. at 33.) Shortly after issuing the Decision

---

2. In 1996, three radio stations were leasing space on plaintiff's tower. Two stations had been added shortly after the construction of the tower in 1984, and a third began leasing space around 1986. The stations each paid rental fees of $1,500 per month, and an initial fee of $68,000 to the Peralta Ridge Users Association, which set aside a portion for site maintenance and distributed the remainder to Association members. (Def.'s Dep. of Belarmino Gonzales, President of Son Broadcasting, Inc., at 62–66; Pl.'s App. at 17–18.)

Memo, the Forest Service dismissed plaintiff's formal appeal.

When construction of the third tower began, plaintiff filed suit in the United States District Court for the District of New Mexico and unsuccessfully sought an injunction. Upon the government's motion, the District Court transferred the suit to the United States Court of Federal Claims in February 1998. Plaintiff asserted claims for breach of contract, detrimental reliance, and violation of 36 C.F.R. § 215, which requires notice and an opportunity for comment regarding proposed changes to land management plans. In December 1998, the Court of Federal Claims dismissed plaintiff's detrimental reliance and notice and comment claims for lack of subject matter jurisdiction. *Son Broadcasting, Inc. v. United States*, 42 Fed.Cl. 532 (1998). The remaining breach of contract claim is the subject of the parties' cross-motions for summary judgment.

The government moves for summary judgment on two main grounds: (1) no binding contract was formed between plaintiff and the Forest Service; and (2) even if a binding contract was formed, it did not prohibit authorization of a third tower before the technical capacity of the first two towers was reached. Plaintiff argues that a binding contract was formed and that the contract prohibits authorization of a third tower before the first two towers have reached capacity.[3]

## ANALYSIS

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1113 (Fed.Cir.2002). Whether a con-

tract exists is a mixed question of law and fact. *California Fed. Bank, F.S.B. v. United States*, 245 F.3d 1342, 1346 (Fed.Cir.2001); *Advance Bank, F.S.B. v. United States*, 52 Fed.Cl. 286, 288 (2002). However, in the absence of factual disputes, the question of contract formation is a question of law. *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir.1997); *Ransom v. United States*, 900 F.2d 242, 244 (Fed.Cir. 1990).

The parties do not dispute the validity of the Permits or the Site Plan. Although meetings took place between the Forest Service, plaintiff, and other interested parties prior to the execution of the Site Plan and the 1983 Permit, the parties do not rely on extrinsic evidence to demonstrate or refute an intention to create a binding contract. Therefore, the issue of contract formation is a question of law amenable to summary judgment resolution. *See Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed.Cir.1998) ("Since the parties do not dispute the relevant facts, the privity issue reduces to a question of law . . . ."). Contract interpretation is also a question of law generally amenable to resolution on summary judgment motions. *Varilease Tech. Group, Inc. v. United States*, 289 F.3d 795, 798 (Fed.Cir. 2002); *Cross Petro. v. United States*, 51 Fed. Cl. 549, 554 (2002).

### B. Contract Formation

■ The creation of a contractual relationship between the government and a contractor is generally governed by common-law legal rules. *Priebe & Sons v. United States*, 332 U.S. 407, 411, 68 S.Ct. 123, 92 L.Ed. 32 (1947); *Fomby–Denson v. Dept. of Army*, 247 F.3d 1366, 1373 (Fed.Cir.2001). "The party alleging a contract must show a mutual intent to contract including an offer, an acceptance, and consideration." *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir.1997). "A contract with the United States also requires that the Government

---

**3.** Plaintiff also moves for summary judgment on the issue of whether the Forest Supervisors had authority to enter into contracts binding upon the government. Authority of the government agent in question to contract is an element in government contract formation analysis. It is therefore addressed as a sub-issue in the analysis of plaintiff's claim to a binding contract with the Forest Service.

representative who entered or ratified the agreement had actual authority to bind the United States." *Id.*

The government makes four main arguments: (1) the Special Use Permit issued by the Forest Service is a license, not a contract; (2) the purported contract lacked consideration because it conferred no benefit to the government; (3) the Forest Service personnel who developed the Site Plan and issued the Permit were not "contracting officers" and therefore did not have the authority to bind the government to a contract; and (4) even if the Permit and the Site Plan did constitute a binding contract with consideration, the third tower restriction language was inserted to protect National Forest System land, not plaintiff's interests, and the Forest Service reserved the right to authorize additional users on the Site at any time.

Plaintiff argues that the Special Use Permits and the incorporated Site Plan established an express and implied-in-fact contract. The Permits were not licenses, but agreements, plaintiff argues, signed by both parties and containing mutual promises and obligations. The resulting contract was therefore supported by consideration. Plaintiff further argues that although they were not "contracting officers," the Forest Service personnel who signed the Permits had authority to issue special use authorizations, which can grant rights as well as privileges to the permittee. Finally, plaintiff argues that the Permits, by incorporation of the Site Plan, prohibit authorization of a third tower until the first two towers have reached capacity.

The Court holds that the Special Use Permit, together with the incorporated Site Plan, constitutes a binding contract between plaintiff and the government and that this contract prohibited construction of the third tower until the first two had reached capacity. The issue of whether the first two towers had reached capacity when the Forest Service approved the third tower has not been fully addressed by either party. Consequently, the Court's decision does not reach the issue of breach, but rather limits its resolution to the issues of contract formation and interpretation.

*1. Authority to Contract*

■ In order for plaintiff to prove the existence of a contract with the United States, it must demonstrate that the Forest Supervisors who issued the Permits had actual authority to bind the United States. *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997); *Total Med. Mgmt., Inc. v. United States,* 104 F.3d 1314, 1319 (Fed.Cir.1997). Actual authority can be either express or implied in fact. *See H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed.Cir.1989). "Government employees hold express actual authority to bind the government in contract only when the Constitution, a statute, or a regulation grants them such authority in unambiguous terms." *Starflight Boats v. United States,* 48 Fed.Cl. 592, 598 (2001); *Roy v. United States,* 38 Fed.Cl. 184, 188 (1997). "Actual authority may be implied when such authority is 'an integral part of the duties assigned to a [g]overnment employee.'" *Roy,* 38 Fed.Cl. at 189 (quoting *Landau,* 886 F.2d at 324 (Fed.Cir.1989)).

■ The government argues that the Forest Supervisors who issued the Permits did not have express actual authority to contract because they were not "contracting officers" with "warrant authority" under Forest Service regulations. Nor, the government maintains, did the Forest Supervisors have implied actual authority to contract because contracting authority was not an "integral part" of their land management duties. Furthermore, to the extent that issuing special use authorizations was an integral part of the Forest Supervisors' duties, the government argues, their authority was limited to certain dollar amounts by acquisition workforce regulations.

Plaintiff acknowledges that Forest Supervisors are not "contracting officers" with "warrant authority" to enter into contracts for the procurement of goods and services under current Forest Service regulations. However, plaintiff argues that the Permits were not contracts for the procurement of goods and services, and therefore the Forest

Supervisors' status under Forest Service procurement regulations is irrelevant. In fact, Forest Service regulations delegate Forest Supervisors the authority to issue special use authorizations that impose restrictions and confer rights on users of National Forest System land. To that extent, plaintiff argues, Forest Supervisors can contractually bind the government.

By their plain language, the Permits and incorporated Site Plan are not contracts by which the Forest Service acquired commercial supplies or services. The parties agree that the primary responsibility of Forest Supervisors is the management of National Forest System land, not the procurement of goods and services. However, as plaintiff points out, it does not follow that Forest Supervisors lack express or implied authority to enter into any binding contracts whatsoever. Forest Service regulations do not require that special use authorizations be issued by a "contracting officer," and the issuance of special use authorizations falls outside the purview of Forest Service regulations governing acquisition workforce personnel.

Forest Service regulations expressly authorize the Chief of Forest Service or, by delegation, the Forest Supervisor to issue special use authorizations. 36 C.F.R. § 251.52. A "special use authorization" is defined as "a permit, term permit, lease, or easement which allows occupancy, use, rights, or privileges of the National Forest System land." 36 C.F.R. § 251.51. Such "special use authorizations ... shall be in such form and contain such terms, stipulations, conditions, and agreements as may be required by regulation of the Secretary and the instructions of the Chief." 36 C.F.R. § 251.52. The Forest Service regulations provide that special use authorizations not only impose conditions on an authorized user's privilege of using National Forest System land, but may also convey rights on that user. *See* 36 C.F.R. 251.54(c) ("Rights or privileges to occupy and use National Forest System lands under this subpart are conveyed only through issuance of a special use authorization."); 36 C.F.R. 251.55(b) ("All rights not expressly granted are retained by the United States, including but not limited to ... (3) the right to require common use of the land or to authorize the use by others in any way not inconsistent with a holder's existing rights and privileges ..."); 36 C.F.R. 251.55(c) ("Special use authorizations are subject to all outstanding valid rights."). To the extent that a special use authorization grants rights to a permittee, it imposes obligations on the Forest Service to respect those rights. Therefore, Forest Service regulations grant Forest Supervisors express actual authority to enter into binding contracts. Even if the regulations are considered too ambiguous to support a finding of express actual authority, the issuance of special use authorizations is sufficiently "integral" to the land management duties of a Forest Supervisor to vest them with implied actual authority to enter into binding contracts.[4]

---

4. The cases cited by defendant on the issue of authority are inapposite. In *Landau,* the Court of Federal Claims held that certain Small Business Administration (SBA) personnel had neither express nor implied actual authority to issue payment guarantees because regulations delegated express authority to more senior SBA officials. *See Landau v. United States,* 20 Cl.Ct. 400 (1990), *on remand from H. Landau & Co. v. United States,* 886 F.2d 322 (Fed.Cir.1989). In *John Doe v. United States,* 48 Fed.Cl. 495, 501–03 (2000), the Court of Federal Claims held that DEA agents did not have express authority to bind the government to an alleged contract to pay the plaintiff informant, in the absence of any statute or regulation granting such authority. The Court also held that the agents lacked implied actual authority because issuing *binding* promises of payment was not integral to the duties of a DEA agent. Finally, in *Salles v. United States,* 156 F.3d 1383 (Fed.Cir.1998), the Federal Circuit held that to the extent rewarding informants was an "integral part" of their duties, DEA agents were limited by a statute which did not authorize payment promises for a percentage of all drug-related seizures.

Unlike the government agents in *Landau* and *John Doe,* the Forest Supervisors who issued plaintiff's Permits were granted express authority by government regulations to issue binding agreements in the form of special use authorizations. Contracting authority was not reserved exclusively for more senior departmental personnel as in *Landau.* Furthermore, the government has identified no statute which limits the nature or value of Forest Service special use authorizations comparable to the statute in *Salles.*

## 2. Special Use Permit as Contract

■ The Special Use Permit issued to plaintiff, and the incorporated Site Plan, satisfy the elements of a binding government contract. Pursuant to Forest Service regulations, special use authorizations may be issued in the form of permits, term permits, leases, or easements. *See* 36 C.F.R. § 251.51. Forest Service regulations define "permit" as "a special use authorization which provides permission, without conveying an interest in land, to occupy and use National Forest System land or facilities for specified purposes, and which is both revocable and terminable." Consistent with this definition, both the 1983 and 1994 Permits explicitly state that they are not transferable—suggesting that they do not convey an interest in land—and are both revocable and terminable. However, the special use authorization issued to plaintiff has more in common with a "term permit" or "lease" under Forest Service regulations than with a simple "permit."

Forest Service regulations define a "term permit" as "a special use authorization to occupy and use National Forest System land ... for a specified period which is both revocable and compensable according to its terms." 36 C.F.R. § 251.51. Both plaintiff's 1983 and 1994 Permits were issued for specific terms, were revocable (the 1994 permit under certain conditions), and required payment of a fair market value fee from plaintiff to the government. The same regulations define "lease" as a special use authorization used "when substantial capital investment is required" and "when conveyance of a conditional and transferable interest in National Forest System lands is necessary or desirable to serve or facilitate long-term uses, and

that may be revocable and compensable according to its terms."

Development of the Peralta Ridge Site, including design and construction of a nearly 300–foot tower and accompanying facilities, undoubtedly required plaintiff to make a substantial capital investment. Furthermore, the 1983 and 1994 Permits, through incorporation of the Site Plan, required plaintiff to build a tower capable of accommodating the antennae of two or more additional users. In addition to requiring a substantial capital investment, the Permits are conditional, requiring plaintiff, *inter alia*, to maintain the premises in accordance with certain standards and to comply with applicable laws and regulations. Also consistent with the Forest Service definition of a lease, the Permit is revocable and compensable according to its terms, requiring plaintiff to pay an annual fee based on the fair market value of its use. However, in contrast to the Forest Service definition of a lease, the Permit plainly states that it is not transferable. Nevertheless, plaintiff's interest in the Peralta Ridge Site was closer to the type contemplated for protection by a lease or a term permit than by a simple permit.[5] Regardless of which category of special use authorization most closely defines plaintiff's Special Use Permit, it satisfies the elements of a contract.

Courts have reached divergent conclusions about whether a particular permit constitutes a binding contract. However, they agree that an examination of the language and characteristics of the permit is critical to the determination. The government cites *Hage v. United States*, 35 Fed.Cl. 147 (1996), for the proposition that special use permits issued by the Forest Service are revocable licences rather than contracts. In *Hage*, the plaintiff rancher claimed that the govern-

---

**5.** This analysis is consistent with the Forest Service's evolving practice with respect to the special use authorization at issue in this case. Upon expiration of plaintiff's 1994 Permit, the Forest Service issued another authorization for plaintiff's use of the Site in 1996, entitled "Communications Use Lease." The issuance of a lease-type authorization to plaintiff accorded with contemporaneous forest service policy regarding authorizations for communications use sites. In approximately 1996, the Forest System began authorizing the users of communications

sites who owned the facilities by Communications Use Lease rather than by Special Use Permit. *See* 62 FR 68074–01, 68083, 1997 WL 791464 (F.R.) (quoting the Forest Service Handbook (FSH) 2709.11, Special Uses Handbook, 48.1–7–4: "Use Form FS–2700–4a, Communications Use Lease, to authorize use of National Forest System lands for communications uses by facility owners and facility managers. Use Form FS–2700–4, Special Use Permit, to authorize tenant and customer use in Federal facilities and charge the full schedule fee for that use ...").

ment breached a contract when it terminated a special use permit allowing him to graze his cattle on Forest Service land. *Id.* at 150. Based on an examination of the characteristics and language of the plaintiff's grazing permit, the Court held that it "ha[d] the traditional characteristics and language of a revokable license, not a contract." *Id.* at 166. Specifically, the court found that the permit did not create affirmative government obligations, that the plaintiff could not legally assign or transfer the permit, and that the government had reserved the right to cancel the permit on certain conditions. *Id.* at 167.

Plaintiff relies heavily on *Meadow Green–Wildcat Corp. v. Hathaway*, 936 F.2d 601, 603–05 (1st Cir.1991), which treated the term permit issued by the Forest Service for the development of a ski resort as a binding agreement between plaintiff and the government. While the court refrained from explicitly holding that a permit is a contract, it applied traditional principles of contract interpretation for the purpose of determining whether to give deference to an agency's interpretation of permit terms. *Id.*

The *Hathaway* court's analysis of the "contract-like character" of the permit is applicable here. The court reasoned that the "document itself reads like a contract" in "provid[ing] long-term authority to use land in return for the permittee's payment of a rental fee." The court also found significant that "the Service's official regulations treat the Term Permit as if it were a kind of contract." For example:

> the regulations state that the Permit is "compensable according to its terms." 36 C.F.R. § 251.51. Moreover, these regulation define a Term Permit very much as they define a "lease," an instrument the terms of which bind the parties.... *Id.* Moreover, the regulations say that a permittee may "sublet the use and occupancy of the premises." 36 C.F.R. § 251.55(a). Further, these regulations reserve for the government specific rights, such as "continuing right of access," *id.* § 251.55(b)(1), thereby suggesting that the permit grants other definite rights to the permittee .... Although the regulations also state that the Government is free to "revoke" or

"terminate" the Permit in the manner and for the reasons specified by the Permit, a contract that one party may terminate for specified reasons is no less a contract .... And unless and until it is terminated, its terms govern actions taken by both parties.

*Hathaway*, 936 F.2d at 604. Finally, the court noted that "one function of the permit is to offer a permittee the security needed to raise many millions of dollars in investment." The court did not believe that "a document, the terms of which one party remains comparatively free to interpret to its own advantage, can provide the other party ... the security, stability, or assurance a large and long-term investment would seem to require." *Id.*

Like the *Hathaway* permit, the Forest Service Special Use Permits possess contract characteristics. Specifically, they establish promises by the Forest Service to plaintiff regarding the authorization of additional users and contain language suggestive of an agreement between plaintiff and the Forest Service. (Pl.'s App. at 7) ("provided such use does not interfere with the *rights* and privileges hereby authorized"; "[n]o member of or Delegate to Congress or Resident Commissioner shall be admitted to any share or part of this *agreement* ...." (emphasis added)). Unlike the "revocable license" in *Hage*, the Special Use Permits issued to plaintiff clearly imposed affirmative obligations on the Forest Service. The 1983 Permit provided that the Forest Service require new users to pay plaintiff a fair share of the original expense borne by plaintiff in the development of the Site for common use. Specifically, the provisions state that "[t]he Forest Service agrees not to issue authorizations to additional users until satisfied that arrangement for paying for the fair share have been made." (Def.'s App. at 20.) Appendix B of the Site Plan, incorporated by reference into both Permits, reserves the Forest Service's right to authorize additional users of a permittee's building and tower. (Def.'s App. at 8.) However, the Forest Service's ability to authorize joint use is subject to at least two conditions that explicitly protect the investment of a permittee such as plaintiff: (1) approval of

additional use must not interfere with the "operations of the permittee" (Def.'s App. at 8.), or "the rights and privileges" authorized by the Permit (Pl.'s App. at 7.); and (2) additional users are required to pay the permittee an equitable rental fee. (Def.'s App. at 8.) Therefore, although the Special Use Permits issued to plaintiff have some of the characteristics of licenses, in that they are nontransferable and revocable, the plain language of the Permits, together with the language of the incorporated Site Plan, imposes binding obligations on both parties.

Second, although perhaps not of the magnitude of the "millions of dollars" at stake in *Hathaway,* plaintiff's investment in the development of the Peralta Ridge Site was substantial, calling for the long-term protection that a mutually-binding agreement would provide. Finally, as noted above, plaintiff's permit shares much in common with the Forest Service definition of a lease, which is binding on both parties. Although the Forest Service reserved certain rights in the Permits, such as the right to revoke or terminate for specified reasons, such reservations do not eradicate the binding nature of the special use permits. For all the reasons articulated by the First Circuit in *Hathaway,* and based on the language and characteristics of the special use permits, the Court holds that plaintiff's Special Use Permits are binding agreements, or contracts with the government. *See also Walter Dawgie Ski Corporation v. United States,* 30 Fed.Cl. 115, 123 (1993) (treating Forest–Service issued special use permits as contract for the purpose of summary judgment, but noting "the general acceptance of these permits as contracts." (citing *Hathaway*)); *Anderson v. Eby,* 998 F.2d 858, 863 (10th Cir.1993), *remanded to* 877 F.Supp. 537 (D.Colo.1995), *aff'd* 83 F.3d 342 (10th Cir.1996) (referring to a Forest Service special use permit as a contract and allowing plaintiff to enforce its provisions as a third-party beneficiary).

### 3. Consideration

■ The government also claims that any contract is unenforceable for lack of consideration. In the context of government contracts, consideration must render a benefit to the government, and not merely a detriment to the contractor. *See City of El Centro v. United States,* 922 F.2d 816, 822 (Fed.Cir. 1990).

■ The 1983 Permit and the Site Plan required plaintiff to build a tower approximately 300 feet tall with the capacity to accommodate one television channel and at least two radio stations. This requirement benefitted the Forest Service by furthering its goal of "maximiz[ing] the number of compatible electronic uses on a minimum site area ..." (Def.'s App. at 3.) Although the Forest Service may have an independent obligation to minimize impact to Forest System land simply as a matter of Forest Service policy, plaintiff's assistance to the Forest Service in fulfilling that obligation through the construction of a sufficient tower constitutes consideration.

Furthermore, the Permits required plaintiff to pay the Forest Service more than just a nominal administrative charge for use of the Peralta Ridge Site. The 1983 Permit stated that "[i]n consideration for this use, the permittee shall pay to the Forest Service ..." annual fees based on the value of plaintiff's facilities and a percentage of the rent plaintiff received from lessees using its equipment. (Def.'s App. at 13.) The 1994 Permit requires that "the holder shall pay annually in advance a sum determined by the Forest Service to be the fair market value of the use authorized." (Pl.'s App. at 3.) These fees, together with the assistance plaintiff provided to the Forest Service in meeting its policy objectives, conferred a sufficient benefit to the government to constitute consideration.

For these reasons, the Special Use Permit, together with the incorporated Site Plan satisfy the elements of a contract. The Forest Supervisors who issued both the 1983 and 1994 Permits had the authority to issue special use authorizations, which can function, as they did in this case, as binding agreements. The Forest Service made an offer to enter into a contract through the Site Plan and Special Use Permits. Plaintiff accepted this offer by means of development of the Site in accordance with the specifications of the Permits and Site Plan, which required it to build

a tower capable of accommodating additional users. Such development constituted consideration because it enabled the Forest Service to further its goal of maximizing electronic uses on a minimum site area.

### C. Contract Interpretation: Prohibition of Third Tower

Contract interpretation begins with the plain language of the agreement. *Northrop Grumman Corp. v. Goldin*, 136 F.3d 1479, 1483 (Fed.Cir.1998); *Pete Vicari Gen. Contractor, Inc. v. United States*, 51 Fed.Cl. 161, 166–67 (2001). If the contract language is clear and unambiguous, a court will give the words their plain and ordinary meaning and will not resort to extrinsic evidence. *Barseback Kraft AB v. United States*, 121 F.3d 1475, 1479 (Fed.Cir.1997); *Unisys Corp. v. United States*, 48 Fed.Cl. 451, 454 (2001).

As noted above, the Site Plan was incorporated by reference into both the 1983 and 1994 Permits, and is part of the binding agreement between the parties. Under the section entitled "Management Decisions and Constraints," the Site Plan authorizes "two antennae towers initially, with an option for a third tower upon approval by the Forest Supervisor." (Def.'s App. at 3.) Later in the same section the Site Plan states that "[i]nitially, two guyed antennae towers are authorized. A third antennae tower which may be self supporting may be authorized when the technical capacity of the intial [sic] two towers is reached." (Def.'s App. at 5.) The plain language of these provisions suggests that although the Forest Service has the discretion to authorize a third tower, the exercise of that discretion is conditioned upon the technical capacity of the first two towers having been reached.[6]

The government argues that the purpose of the Site Plan's third-tower provisions is to serve the government interest of protecting National Forest System land, and not plain-

tiff's financial interests, and therefore, the Forest Service's alleged violation of that language could not work a material breach of the contract. The government's reliance on *Robo Wash, Inc. v. United States*, 223 Ct.Cl. 693, 697 (1980) is readily distinguishable. Unlike the *Robo Wash* plaintiffs, whose breach of contract claim was dismissed because, as employees, they were not parties to their company's alleged contract, plaintiff is a direct party to a binding government contract, and the third-tower restriction is a condition of that contract capable of breach by the Forest Service.

The government also argues that the terms of the Permits and Site Plan do not limit the authority of the Forest Service to approve construction of a third tower because the government reserved the right to authorize other users on the Site, and therefore, the Forest Service could not have breached any contract with plaintiff. The government relies on the Site Plan provision that "[e]ach nonexclusive permit will reserve the right of the Forest Service to authorize additional users on the site, building, or antennae tower of the holder provided that such use not unreasonably interfere with holders operations." (Def.'s App. at 3.) The 1994 Permit plainly provides that the Forest Service reserved the right to authorize other users only if "such use does not interfere with the rights and privileges" authorized by the Permit. (Pl.'s App. at 7.) Similarly, under the 1994 Permit, the right of the Forest Service to terminate or revoke the authorization could only be exercised in a limited set of circumstances. (Pl.'s App. at 2.) Finally, the 1983 Permit provision giving the Forest Service discretion to reduce or enlarge the site area was limited to the area not occupied by plaintiff's building or tower. (Def.'s App. at 19.) In other words, the reservation of rights clauses in both the Permits and the incorporated Site Plan are conditioned on noninterference with plaintiff's rights. Plain-

---

6. The parties rely only on the Site Plan and the Special Use Permits to support their contract arguments, and the Court holds that this evidence is unambiguous regarding construction of a third tower. In any event, the extrinsic evidence of Forest Supervisor Perry's 1982 letter only reinforces the plain meaning of the Site

Plan's third tower provisions. Perry states "[a] third tower for additional FM's will only be considered when placement on the first two towers is technologically infeasible and economically unreasonable as compared to the cost and impacts of a third tower." (Def.'s App. at 35.)

tiff's rights under the contract embodied in these documents included the right to rent out all available space on its tower—as long as it was economically and technologically feasible—before the Forest Service could authorize construction of a third tower.

## CONCLUSION

For the reasons discussed above, the Court denies defendant's supplemental motion to dismiss and for summary judgment, and grants plaintiff's motion for partial summary judgment, on the ground that:

(1) The Special Use Permits and the incorporated Site Plan constitute a contract between plaintiff and the Forest Service; and

(2) the contract precluded development of a third tower until the technical capacity of the preexisting towers had been reached.

Within thirty days of this decision, the parties shall file a joint status report setting forth a proposed schedule for further proceedings on remaining liability and other issues in this case.

**IT IS SO ORDERED.**